UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00074

C.A.F. & ASSOCIATES, LLC                                             Plaintiff

v.

PORTAGE, INC.                                                       Defendants
and
PADUCAH REMEDIATION SERVICES, LLC

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Plaintiff C.A.F. & Associates, LLC's Motion for Partial Summary Judgment, (Docket No. 35), and Defendants Paducah Remediation Services, LLC, and Portage, Inc.'s Motions for Summary Judgment, (Docket Nos. 34 & 36, respectively). Defendants have responded to Plaintiff's Motion, (Docket Nos. 38 & 40), and Plaintiff has replied, (Docket No. 43; 47); Plaintiff has also responded to Defendants' Motions (Docket Nos. 41; 42), and Defendant Portage, Inc., has replied, (Docket No. 48). This matter is now ripe for adjudication. Because the parties' several motions are necessarily related, the Court will address the parties' respective arguments collectively in this Opinion. For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment, (Docket No. 35), is DENIED; and Defendants' Motions for Summary Judgment, (Docket Nos. 34 & 36), are each GRANTED IN PART and DENIED IN PART.

BACKGROUND

This matter centers on a dispute between Plaintiff C.A.F. & Associates, LLC (CAF), and Defendants Portage, Inc. (Portage), and Paducah Remediation Services, LLC (PRS) (collectively "Defendants").  PRS was formed by Shaw Environmental, Inc. (Shaw), and Portage Environmental, Inc. (now known as Portage) for the purpose of bidding on a Department of Energy (DOE) contract (DOE Contract) to manage the environmental cleanup operation at the Paducah Gaseous Diffusion Plant (PGDP).  Management of PRS was shared between Portage and Shaw, but Portage was the controlling member.  PRS won the bid and began managing cleanup at the PDGP in July 2005.

After performing under the DOE Contract for nearly four years, PRS terminated its PGDP site manager in February 2009, citing poor performance.  (*See* Docket No. 35-2, at 6.)  Michael Spry, president of both PRS and Portage, took over as interim site manager until April 2009 when Dan McDonald was hired.   McDonald quit approximately six weeks later.  The parties offer varying characterizations of how the relationship between Portage and Dennis Ferrigno, CAF's principal, began.  In effect, Portage and Ferrigno began talks in late spring or early summer of 2009 about Ferrigno serving as site manager and CAF providing site-management services at the PGDP site. (*See* Docket Nos. 35-1, at 2-3; 36-1, at 1-2; 34-2, at 1-2.)     Negotiations among Ferrigno/CAF, Portage, and PRS (who were all represented by counsel during the negotiation process) carried on over several months and produced successive versions of variously styled draft agreements among the parties.  The last of these took the form

of a "Memorandum of Understanding" (MOU), which was signed by Ferrigno and CAF

on September 1 and by PRS and Portage on September 15, 2009.  (*See* Docket No. 36-

2, at 6.)  This MOU is at the heart of the instant debate and the parties' respective

Motions.

The MOU consists of four pages of substance plus twenty-some-odd pages of

attachments.  It opens with the following two paragraphs (altered only to simplify the

parties' names):

> This Memorandum of Understanding hereby states the mutual
> understanding and intent of [Portage, PRS, CAF, and Ferrigno],
> to enter into a business relationship.  The business relationship
> defined in this Memorandum of Understanding (MOU) is
> structured to allow Portage, Ferrigno and CAF to meet multiple
> short-term and long-term strategic goals and provide benefit to all
> parties.
>
> This MOU is created solely for purposes of outlining the general
> terms for the business relationship, including the possible
> acquisition of certain assets of CAF by Portage and is not
> intended to be an offer to sell or to purchase securities or any
> other interest.  Neither party shall be bound to take any specific
> action other than what is described in this MOU unless and until
> definitive subcontracts, offer letters, employment agreements and
> an asset purchase agreement has been executed by the parties
> (collectively, the "Additional Agreements").

(Docket No. 36-2, at 2.)  The MOU goes on to outline these "Additional Agreements"

under the section headings "Subcontract No. 1," "Subcontract No. 2," "Contingent

Offer Letter," and "Asset Purchase Agreement."   (Docket No. 36-2, at 2-4.)   The

primary issue here relates to the first Additional Agreement, "Subcontract No. 1," about which the MOU provides, in pertinent part:

> Subcontract to be prepared in the ordinary course of business between Portage and CAF to retain the services of Ferrigno and twenty (20) additional full-time staff equivalents (FTEs) to support Portage . . . or other ventures controlled or directed by [it].

- Specifically, Ferrigno shall be become [sic] the site manager for [PRS], on or about September 01, 2009 and in that capacity will represent Portage in the management and operation of [PRS]. . . .
- Upon acceptance by the [DOE] of Ferrigno as site manager for the current work through its present period, Ferrigno shall receive from Portage/PRS joint venture $50,000 sign-on bonus for accepting the site manager position. . . .
  . . . .
- The additional twenty (20) CAF FTEs to be provided to Portage and/or [PRS] shall be utilized in a staff augmentation role and, beginning on or about August 17, 2009. The CAF staff shall start to be placed on contracts held by Portage and/or [PRS] with the goal of placing all twenty (20) FTEs no later than December 31, 2009. Regardless of the contract period for the [PRS] Contract extension, the parties agree that the term of subcontract for these 20 staff shall not be less than 1 year starting from the date of hire, and may extend through the date of the [PRS] Contract extension. Portage will support CAF's efforts to recruit and relocate individual CAF employees and, where appropriate, may transfer to CAF some of the employees leaving Portage or [PRS].
- Attachment 1 . . . is included as reference. This document summarizes the . . . contract agreements, terms, conditions, compensation and expectations for all activities associated with CAF and PRS, each of which shall be individually negotiated by Portage and CAF contracts and finance departments prior to execution.

(Docket No. 36-2, at 2-3.)   After addressing each of the remaining Additional Agreements envisioned by the MOU, a section appears titled "Additional Terms and Conditions," which states, in relevant part:

> The following additional terms and conditions apply to this MOU and to the Additional Agreements described herein.
>
> - Due Diligence.  All parties will hereby make available to the other all relevant information and records necessary to give full force and effect to this MOU and to enter into the Additional Agreements.
> - Due Diligence Results.  If for any reason the result of any party's Due Diligence are unsatisfactory, that party will have the right not to proceed with any Additional Agreements without penalty, except as provided under Asset Purchase Agreement.

(Docket No. 36-2, at 5.)  And finally, the MOU concludes with a final sentence:

> This MOU does not purport to summarize all of the provisions which would be contained in the definitive transaction documents, but does contain a general description of the parties' intentions for entering into the Additional Agreements.

(Docket No. 36-2, at 5.)

Of principal import to each of CAF's causes of action is the issue of the 20 FTEs.  There is no dispute that no subcontracts were ever entered into for the 20 FTEs. According to Defendants, "the reason Portage entered into an MOU rather than a subcontract was because they could not yet define what opportunities it could provide for the 20 additional FTEs."   (Docket No. 36-1; *see also* Docket No. 50-6, at 8.) Consistent with this position, Portage's then-president Mike Spry testified that he did

not promise Ferrigno that 20 FTEs would be hired because he could neither guarantee there would be sufficient work available nor that a subcontract could be negotiated for the 20 FTEs' services.  (Docket No. 36-1, at 7-8; *see also* Docket No. 50-4, at 14-15.) Thus, from Portage's perspective, the MOU did not reflect a binding agreement to hire the 20 FTEs.

Portage also alleges that the reason no subcontracts were entered into for the 20 FTEs was ultimately CAF's fault for two reasons:  (1) because CAF "refused to fill any positions requested by Portage under the guise that Portage was obligated to retain CAF only for 'professional' positions, a condition specifically negotiated out of the MOU," and (2) because CAF neither provided a rate structure typical of federal contractors performing cost-plus-type contracts, nor demonstrated it had an adequate cost-accounting system typical of federal contractors.  (Docket No. 36-1, at 8.)  In regard to its first reason, Portage insists it presented CAF an opportunity to provide "well in excess" of 20 FTEs in August 2010 on a project in Los Alamos, New Mexico, for positions including CDL truck drivers, radiological control technicians, "persons in charge" (*i.e.*, project managers), operation center operators (which Portage describes as "typically engineers and scientists"), and equipment operators and laborers.  (Docket No. 36-1, at 8-9.)  But, says Portage, "CAF refused to supply any of these positions under the guise that Portage was obligated to offer 'professional' staff positions," a term which Portage maintains "was specifically negotiated out of the MOU in relation to the 20 additional FTE's."  (Docket No. 36-1, at 9.)

CAF and Ferrigno, however, see the issue of the 20 FTEs quite differently. According to CAF, the 20 FTEs played a "central role . . . in the negotiation to entice Ferrigno to take the position at PGDP." (Docket No. 41, at 4.) CAF relates that during the negotiations leading up to the MOU Portage tried to make the 20 FTEs optional, but Ferrigno unequivocally conveyed to Portage that the 20 FTEs were needed as a concession to compensate CAF, given that CAF would effectively have no other business while Ferrigno worked full-time on the PGDP project in Paducah. (Docket Nos. 35-1, at 3-4; 35-5.) CAF argues that Portage's offer to employ CAF personnel at the Los Alamos site was mere pretext in that it "came nearly a year beyond the time frame set forth in the MOU" and "offered positions Portage knew were not compatible with CAF's areas of expertise." (Docket No. 41, at 11.) CAF also rebuts Portage's accusations regarding CAF's accounting system as meritless in light of the facts that "the DOE approved the rates for the CAF personnel at 100% of the invoiced amount," that CAF had previously done work with prime contractors for the DOE without issue, and that any changes to CAF's accounting system that might have been needed could have been put in place in a matter of days. (Docket No. 41, at 16-17.)

On October 26, 2009, a definitive subcontract was entered into between CAF and Portage for the services of Ferrigno and two other CAF associates, Paul Deltete and Paul Bengel.[1] (*See* Docket No. 36-3.) That subcontract set the specific terms of CAF's agreement to provide site-management services at the PGDP, including:  a statement of

---

[1] "Subcontract 2," referenced in the MOU, relates specifically to the services of Deltete and Bengel. (*See* Docket No. 36-2, at 3.)

the work to be provided; effective dates; a ceiling price; individual labor rates for Ferrigno, Deltete, and Bengel; invoicing requirements; and a list of additional agreements, some boilerplate and some tailor-made for that particular agreement. (*See* Docket No. 36-3, at 2-6.)  The subcontract was subsequently modified to increase the ceiling price and extend the period of performance. (*See* Docket No. 26-4, at 2.)  That modification also set forth the specific terms for an additional CAF associate, Doug Reinhart.  (Docket No. 26-4, at 2.)

In short, CAF performed services at the PGDP under the definitive subcontracts through July 26, 2010, and was compensated approximately $1.9 million for its work. (*See* Docket Nos. 36-1, at 7; 36-5; 50-5, at 8.)  CAF then filed suit in this Court on April 28, 2011, against Portage and PRS.  (Docket No. 1.)     In its Complaint, CAF alleges eight causes of action: (1) breach of contract, based on Defendants' failure to hire 20 FTEs under the terms of the MOU; (2) in *quantum meruit*, seeking compensation for the salaries of the 20 FTEs; (3) unjust enrichment, based on Defendants' failure to hire the 20 FTEs; (4) promissory estoppel, based on CAF and Ferrigno's reliance on Defendants' promise to hire 20 FTEs; (5) breach of the duty of good faith and fair dealing, in that Defendants knew they would not hire the 20 FTEs and then offered to employ FTEs of a substantially lesser value than CAF anticipated; (6) negligent misrepresentation, insofar as Defendants failed to exercise ordinary and reasonable care in representing to CAF they would hire 20 FTEs when they should have known those representations were false; (7) fraudulent misrepresentation, in that Defendants represented to CAF they would hire 20 FTEs with knowledge those representations

were false; (8) defamation; and (9) tortious interference.  (*See* Docket No. 1, at 15-21.)  In responding to Portage's Motion for Summary Judgment CAF states it "does not intend to pursue further its Tortious Interference or Defamation Claims."  (Docket No. 41, at 37.)  Therefore, the Court will limit its discussion to CAF's claims in counts 1 through 7 and will not address CAF's tortious interference and defamation claims on the basis that CAF has elected to voluntarily dismiss those claims.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Monette v. Elec.*

*Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Finally, while the substantive law of Kentucky is applicable here pursuant to *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010).

## DISCUSSION

In their Motions for Summary Judgment, Defendants argue that summary judgment is appropriate on each of CAF's various causes of action. In CAF's Motion for Partial Summary Judgment, CAF seeks summary judgment solely on its breach of contact claim. The Court will begin its discussion by addressing the breach of contract

issue and the parties' competing motions for summary judgment thereon. The Court will then proceed to address Defendants' Motions for Summary Judgment on each of CAF's remaining claims in turn.

## I.        Breach of Contract

In essence, CAF argues that partial summary judgment is appropriate because the MOU represents a binding and enforceable agreement between it and Defendants, that Defendants breached that agreement, and that it has sustained damages as a result. To the contrary, Defendants insist that summary judgment is appropriate because the MOU is a nonbinding preliminary agreement—not an enforceable contract—and because even if it were enforceable, Defendants have not breached its terms. The parties agree that whether the MOU is enforceable is a question of law to be resolved by the Court. *E.g.*, *Dowell v. Safe Auto Ins. Co.*, 208 S.W.3d 872, 875 (Ky. 2006) ("It is well established that construction and interpretation of a written instrument are questions of law for the courts." (quoting *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. Ct. App. 1998))). Because the Court finds the MOU represents an unenforceable preliminary agreement, it need not address whether Defendants breached its terms.

### A.        The terms of the MOU are unambiguous.

"In the absence of an ambiguity, Kentucky courts will enforce a written instrument strictly according to its terms and will assign those terms their ordinary meaning." *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005) (citing *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)). Thus, an

initial question that must be resolved is whether the written instrument—the MOU—is ambiguous. "A contractual term is ambiguous if it is reasonably susceptible to different or inconsistent interpretations." *Id.* (citing *Transp. Ins. Co. v. Ford*, 886 S.W.2d 901, 905 (Ky. Ct. App. 1994)). Unless the court finds a term to be ambiguous, it cannot "[u]nder Kentucky law . . . reference extrinsic facts or aids" to interpret its meaning. *Id.* (citing *Frear*, 103 S.W.3d at 106; 11 Richard A. Lord, *Williston on Contracts* § 30:6 (4th ed.)). However, if the Court finds "ambiguity . . . apparent on the face of the instrument itself," *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000), it may consider statements made by the parties to interpret the ambiguous language without running afoul of the parole evidence rule's bar against "oral statements or writings made prior to or contemporaneous with a written agreement that contradict, vary or alter the language appearing in the writing." *Davis*, 399 F. Supp. 2d at 793 (citing, *e.g.*, *Luttrell v. Cooper Indus., Inc.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998); *Johnson v. Dalton*, 318 S.W.2d 415, 417 (Ky. 1958); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)). "In other words, one cannot use parol evidence to create ambiguity in an otherwise unambiguous document." *Id.*

The parties do not identify specifically which, if any, terms of the MOU are or are not ambiguous. Rather, both sides seem to argue the enforceability of the MOU based on their respective readings of its unambiguous terms. (Although CAF does appear to argue that should the MOU be found ambiguous, extrinsic evidence nonetheless supports its position that the MOU is enforceable.) Upon reviewing the MOU, the Court is satisfied that as a general matter, its terms are sufficiently clear and

unambiguous that Kentucky law would not permit consideration of extrinsic facts or aids to determine their meaning.  Similarly, the Court finds no ambiguity "on the face" of the MOU such that the parties' precontractual statements and writings are thus relieved of the parole evidence rule's bar against them.  Accordingly, the Court will proceed to the question whether the MOU represents an enforceable agreement

###    B.    The MOU is an unenforceable preliminary agreement.

"To establish a breach of contract claim under Kentucky law, the plaintiff must show by clear and convincing evidence that an agreement existed between the parties." *Associated Warehousing, Inc. v. Banterra Corp.*, 2010 WL 2745981, at *2 (W.D. Ky. July 9, 2010), *aff'd*, 2012 WL 2478350 (6th Cir. June 28, 2012); *see also Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001).  "An enforceable contract must contain definite and certain terms setting forth promises of performance to be rendered by each party."  *Kovacs v. Freeman,* 957 S.W.2d 251, 254 (Ky. 1997) (citing *Fisher v. Long*, 172 S.W.2d 545 (Ky. 1943)).  While every possible term need not be defined, the agreement must set forth the "essential terms" of the deal. *Auto Channel,* 144 F. Supp. 2d at 790.  "Mutuality of obligations is an essential element of a contract, and if one party is not bound, neither is bound."  *Kovacs*, 957 S.W.2d at 254 (citing *Morgan v. Morgan*, 218 S.W.2d 410 (Ky. 1949)).

Kentucky follows the traditional "all or nothing" approach to preliminary agreements: "Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less."  *Cinelli*, 997 S.W.2d at 478.

"To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations."  *Walker v. Keith*, 382 S.W.2d 198, 201 (Ky. 1964).  Thus, "the parties must either agree upon the material terms or supply a 'definite method of ascertaining' [them]." *Cinelli,* 997 S.W.2d at 477 (citing *Walker*, 382 S.W.2d at 202).  Material terms are those terms essential to the enforcement of a contract.  *See Warren v. Cary–Glendon Coal Co.*, 230 S.W.2d 638, 640 (Ky. 1950) ("[I]t is essential that the contract itself be specific and the certainty required must extend to all particulars essential to the enforcement of the contract, such as the subject matter and purpose of the contract, the parties, the consideration, the time and place of performance, terms of payment and duration of the contract.").

 *Cinelli* is the leading and authoritative Kentucky case on the issue of preliminary agreements between sophisticated business entities. *See Giverny Gardens, Ltd. P'ship v. Columbia Hous. Partners Ltd. P'ship*, 147 F. App'x 443, 446 (6th Cir. 2005).  In *Cinelli*:

> [A] telecommunications company entered into a preliminary agreement with a buyer, who agreed to lend the company $2.65 million in exchange for 54% of the stock. The agreement left open various terms, such as the completion of due diligence and obtaining necessary authorizations for the transfer. However, the agreement explicitly stated:  "The parties acknowledge and agree that this Agreement is a valid and binding agreement, enforceable against each of them in accordance with its terms."

*Id.* (internal citations omitted) (discussing *Cinelli*, 997 S.W.2d at 476, 481-82).  The *Cinelli* court noted that the agreement contemplated the future sale of the company and held that "where an agreement leaves the resolution of material terms to future

negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negations fail." *Cinelli*, 997 S.W.2d at 477. The *Cinelli* court also looked at the intent of the parties based on the agreement to conclude the parties did not intend the agreement to constitute a binding contract. *Id.* at 478. The plaintiff there argued the agreement was intended to be an enforceable contract; the court, however, rejected that argument on the bases that throughout negotiations the parties modified or attempted to modify the agreement's terms and that the agreement itself contemplated the possibility that the deal might not close. The court concluded instead that "the parties merely intended the Agreement to reflect the current status of their negotiations and to bind each to negotiate with 'best efforts' for a specified period." *Id.*

In another Kentucky Court of Appeals case, *Gray v. First State Fin., Inc.*, the court held the disputed agreement was too indefinite to be enforceable where it lacked a closing date and was never approved by the necessary committee. 2009 WL 2971673, at *2 (Ky. Ct. App. Sept. 18, 2009). In *Gray*, the plaintiff testified that after a meeting in November 2002, she believed she would be entering into an installment loan agreement with the defendant bank. *Id.* at *3. The document allegedly creating an enforceable contract was a March 2003 loan request by a loan officer to the loan committee. *Id.* The court explained that although the document:

> listed the loan's amount, interest rate and duration, the loan [request] was an internal bank document which provided no evidence that the terms had been conveyed to [the plaintiff]. The request not only lacked a closing date ..., but the requested loan in fact was never approved by the necessary committee. Thus, any

>   alleged agreement to make a loan was too indefinite to be
>   enforceable.

*Id.*

And in *Giverny Gardens, Ltd. P'ship v. Columbia Hous. Ltd. P'ship*, the Sixth Circuit, applying *Cinelli*, held that a letter of intent was an unenforceable preliminary agreement under "the traditional Kentucky rule [that] clear-preliminary agreements . . . are unenforceable."   147 F. App'x at 450.   There, the Sixth Circuit observed four characteristics common to the preliminary agreements in *Cinelli* and in the case before it: (1) "the preliminary agreements in both cases are long, detailing numerous terms and conditions of the proposed business arrangement"; (2) the parties in both cases are sophisticated business entities negotiating a significant business deal at arms-length; (3) in both cases, the parties left open "the consummation of the deal dependent on the completion of due diligence and regulatory approval"; and (4) "though the parties in both cases apparently intended the preliminary agreements to be binding, the terms of the agreements specifically contemplated the possibility that the deal could fall through." *Id.* at 449-50 (referencing *Cinelli*, 997 S.W.2d at 476-77, 479-82).

Based on its reading of *Cinelli*, *Gray*, and *Giverny Gardens*, the Court finds that the MOU here is not a binding contract for several reasons.  First, the MOU states in the second paragraph of its preamble, "This MOU is created solely for purposes of outlining the general terms for the business relationship."  (Docket No. 36-2, at 2.)  It goes on, "Neither party shall be bound to take any specific action other than as described in this MOU unless and until definitive subcontracts, offer letters, employment agreements and an asset purchase agreement has been executed by the

parties." (Docket No. 36-2, at 2.) And it concludes, in its closing paragraph, "This MOU does not purport to summarize all of the provisions which would be contained in the definitive transaction documents, but does contain a general description of the parties' intentions for entering into the Additional Agreements." (Docket No. 36-2, at 5.) The provision regarding the 20 FTEs appears under the general description for "Subcontract No. 1," which begins, "Subcontract *to be prepared in the ordinary course of business*." (Docket No. 36-2, at 2 (emphasis added).) That provision clearly lacks a number of material terms concerning the 20 FTEs. It does not specify who these FTEs will be or what specific services they will provide, but only that they "shall be utilized in a staff augmentation role." It does not specify what qualifications or other requirements will be applicable to them. It does not even touch on how much they will be paid or establish any parameters relating to their compensation. It does not specify where they will work or for whom they necessarily would be working, but states only that they will be retained "to support Portage and/or [PRS], or other ventures controlled by or directed by those entities." It does not specify definitively when their employment will actually begin or end; instead, it provides only that they will start to be place "beginning on or about August 17, 2009 . . . *with the goal of* placing all twenty [by] December 31, 2009" for a term of at least one year. (Docket No. 36-2, at 3 (emphasis added).) These are certainly material terms, and they are lacking from the MOU.

Moreover, the plain language of the provision relating to the 20 FTEs clearly contemplates further negotiations of these material terms. That provision even

references an attached draft personal service agreement (PSA)—which leaves the amount of compensation for 20 FTEs blank, (*see* Docket No. 36-2, at 10)—and in that reference clearly states: "PSA Sample Draft agreement is included as reference.  This document summaries the PRS PSA contract agreements, terms, conditions, compensation and expectations for all activities associated with CAF and PRS, *each of which shall be individually negotiated* by Portage and CAF contracts and finance departments *prior to execution*."  (Docket No. 36-2, at 3 (emphasis added).)  The court in *Cinelli* specifically held such further negotiations of material terms renders an agreement unenforceable as a contract.  *See* 997 S.W.2d at 478; *accord Walker*, 382 S.W.2d at 201 ("To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations.")

Additionally, like the preliminary agreements in *Giverny Gardens* and *Cinelli*, the MOU here is long and outlines multiple contemplated transactions.[2]  Also like those cases, the parties are all sophisticated business entities, represented by counsel, who negotiated at arms-length a contemplated business deal.  As in *Giverny Gardens* and *Cinelli*, where "the parties left consummation of the deal dependent on the completion of due diligence and regulatory approval," the MOU here specifically provides, "If for any reason the result of any party's Due Diligence are unsatisfactory, that party will

---

[2] The agreements in *Giverny Gardens* and *Cinelli* were 9 and 5 pages long, respectively.  *See Giverny Gardens*, 147 F. App'x at 449.  The MOU here is four single-spaced pages in substance plus a signature page and 23 pages of attachments for 28 total pages.  (*See* Docket No. 36-2, at 2-29.)

have the right not to proceed with any Additional Agreements without penalty." (Docket No. 36-2, at 4.)  And finally, that same due diligence provision in the MOU also evinces the parties' contemplating that the "deal could fall through," not unlike the agreements in *Giverny Gardens* and *Cinelli*.

CAF suggests that *Giverny Gardens* and *Cinelli* are distinguishable here and that the Court should instead look to the surrounding circumstances and the parties' conduct to conclude the MOU is enforceable.  Specifically, CAF points to the *Cinelli* court's language that "[w]here an agreement leaves resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail."  997 S.W.2d at 477.

The Court is unpersuaded in this regard for several reasons.  For one, that statement by the *Cinelli* court was made in comparing *Simpson v. JOC Coal, Inc.*, 677 S.W.2d 305 (Ky. 1984), to *Walker v. Keith*, 382 S.W.2d 198 (Ky. 1964).  In *Simpson*, the missing material term—namely, the price term—was easily ascertainable using a contemporaneous sale agreement as the applicable standard.  That case involved an agreement between majority shareholders of a mining company to sell their shares to the defendant.  The plaintiff in *Simpson* was a minority shareholder.  The agreement between the majority shareholders and the defendant recognized the plaintiff's interest, stating the defendant "will undertake to conclude a similar arrangement with [the plaintiff]."  *Id.* at 306-07.  However, the plaintiff was not a party to that agreement.  The

plaintiff brought suit to enforce the agreement as a third-party beneficiary.   The defendant argued that the agreement was unenforceable as to the plaintiff, insisting it was "too indefinite and uncertain in its terms" because it was missing the price term for the purchase of the plaintiff's shares.   *Id.* at 307.    The Kentucky Supreme Court disagreed, reasoning that "the contract obligates [the defendant] to undertake to conclude a similar agreement with [the plaintiff], which is subject to a reasonable interpretation as meaning to make [the plaintiff] a similar offer for his shares."   *Id.* at 309.   Because "the trial court could determine the value from a contemporaneous, bona fide sale," the Court found a clear standard from which the trial court could supplant the missing price term.   *Id.*

The *Cinelli* court contrasted the facts of *Simpson*, where it found "the unresolved material terms were easily determined by reference to the majority shareholders' agreement," with those of *Walker*, where "there was no similarly agreed-upon 'definite method of ascertaining' such material terms."   *Cinelli*, 997 S.W.2d at 477-78.   CAF argues that "the evidence here is sufficient to supply a standard by which the court could determine the terms of the employment of the twenty FTEs."   (Docket No. 41, at 24.)   In this regard, CAF refers the Court to the back-and-forth exchange of spreadsheets between CAF and Portage.   (*See* Docket Nos. 41, at 25; 41-3; 41-6; 41-7.) But the Court views these as merely reflections of the ongoing negotiations among the parties in regard to entering into a subcontract for the 20 FTEs—or, as Defendants frame it, as representative of nothing more than "CAF's unilateral expectation." (Docket No. 48, at 9.)   Either way, the Court is convinced these exchanges are

insufficient to establish an agreed-upon standard by which this Court could supplant the numerous open terms relative to the 20 FTEs.  As the Kentucky Court of Appeals put it in *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms."  94 S.W.3d 381, 385 (Ky. Ct. App. 2002) (citing *Green v. McGrath*, 662 F. Supp. 337, 342 (E.D. Ky. 1986)).  Furthermore, unlike *Simpson* where it appears the only missing material term was the price, here there are numerous other missing terms in relation to the employment of the 20 FTEs.  By the terms of the MOU, the role of these individuals is defined only as serving "in a staff augmentation role."  (Docket No. 36-2, at 3.)  Thus, as in *Cinelli*, the Court finds no clearly supplied standard or agreed-upon method by which it could supplant the numerous open terms and that for the Court to do so would be nothing more than sheer conjecture on its part.

CAF next argues that the Court should consider external evidence of the parties' intent to create a binding contract in the part performance by both CAF and Portage of certain obligations outlined in the MOU.  (*See* Docket No. 41, at 26.)  Specifically, CAF points to the facts that it relocated Ferrigno to Paducah as contemplated by the MOU and that Portage paid Ferrigno the $50,000 sign-on bonus also contemplated by the MOU.  "Under Kentucky law, the equitable doctrine of part performance can render an otherwise unenforceable agreement binding on both parties."  *Associated Warehousing, Inc. v. Banterra Corp.*, 2012 WL 2478350, at * 2 (6th Cir. June 28, 2012) (citing *Talamini v. Rosa*, 77 S.W.2d 627, 630 (Ky. 1934)).  In *Associated Warehousing*, the

Sixth Circuit referenced *Talamini v. Rosa*, a decision in which Kentucky's then-highest court stated:

> If . . . the side of the agreement which was originally too vague for enforcement becomes definite by entire or partial performance, the other side of the agreement (or a divisible part thereof, corresponding to the performance received), though originally unenforceable, becomes binding. . . . But if, in spite of part performance by one party to an indivisible agreement his promises remain indefinite, he cannot enforce the promises of the other party, unless what has been done amount to substantial performance.

*Talamini*, 77 S.W.2d at 630.

Under the facts here, the Court does not believe the part performance by either party somehow renders binding the remaining provisions contemplated in the MOU. For one, the details of Ferrigno's relocation to Paducah was negotiated and agreed upon by a separate definitive subcontract; thus, while the subcontract for Ferrigno's services was contemplated by the MOU, CAF's action of sending Ferrigno to Paducah was made not pursuant to the MOU, but to that definitive subcontract for his services.  (*See* Docket No. 36-3.)  And Portage's payment of the sign-on bonus is wholly separate from the issue of the 20 FTEs.  Here, CAF did not actually provide the 20 FTEs, the 20 FTEs were never hired by Portage, and Portage never paid any of the 20 FTEs.  Thus, neither party can be said to have performed any part with respect to the 20 FTEs.  Furthermore, the MOU was not the sort of "indivisible agreement" envisioned by *Talamini*; rather, it represented a number of contemplated transactions, only one of which was that the parties would negotiate a subcontract for the 20 FTEs.  Finally, the MOU's clear

language demonstrates that the contemplated transactions were themselves to be governed by separately executed "Additional Agreements," one of which being for the 20 FTEs.  (*See* Docket No. 36-2, at 2 ("Neither party shall be bound to take any specific action other than as described in this MOU unless and until definitive subcontracts [and] employment agreements . . . ha[ve] been executed by the parties . . . .").)  Therefore, the Court finds the doctrine of part performance inapplicable with respect to the 20 FTEs.

* * * * *

For the reasons above, the Court finds that under the unambiguous terms of the MOU, and based on the fact that numerous material terms are absent or left to be negotiated, under Kentucky law, the MOU is an unenforceable preliminary agreement and not a binding contract.  Because CAF cannot show by clear and convincing evidence that an enforceable agreement existed, its breach of contract claim fails as a matter of law.  Accordingly, there being no genuine issue of material fact, in regard to CAF's breach of contract claim the Court will GRANT Defendants' Motions for Summary Judgment and DENY CAF's Motion for Partial Summary Judgment.

## II.     *Quantum Meruit*

In Count 2 of its Complaint, CAF alleges that it "provided valuable services to Portage and PRS in its management of the PGDP site under circumstances that the Defendants knew or reasonably should have known that CAF intended to be fully compensated."  (Docket No. 1, at 16.)  To that end, CAF seeks compensation for

"payment for the salaries of 20 CAF FTEs." (Docket No. 1, at 16.) Portage argues that because it entered into a definitive subcontract with CAF for Ferrigno's services and paid him in full pursuant to that subcontract, CAF cannot maintain its claim in *quantum meruit*. (*See* Docket No. 36-1, at 20.)

In order to prevail on a *quantum meruit* claim under Kentucky law, a plaintiff must establish four elements:

1. that valuable services were rendered . . . ;
2. to the person from whom recovery is sought;
3. which services were accepted by that person, or at least were received by that person or were rendered with the knowledge and consent of that person; and
4. under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person.

*Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n*, 242 S.W.3d 359, 366 (Ky. Ct. App. 2007) (citing 66 Am. Jur. 2d *Restitution and Implied Contracts* § 38 (2001)); *accord J.P. White v. Poe*, 2011 WL 1706751 (Ky. Ct. App. May 6, 2011). Further, "an essential element for recovery in quantum meruit . . . is that the party seeking recovery must perform some service for which he must be compensated in order to avoid unjustly enriching the other party." *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 642 (Ky. Ct. App. 2003). As the Kentucky Court of Appeals recently stated in *J.P. White v. Poe*, "*Quantum meruit* literally means 'as much as he has deserved.'" 2011 WL 1706751, at *5 (quoting Black's Law Dictionary 1255 (7th ed. 1999)). Thus, damages based on *quantum meruit* "are based on the legal fiction implying an obligation to pay reasonable compensation for services rendered." *Id.* (referencing 66 Am. Jur. 2d

*Restitution and Implied Contracts* §§ 6, 37 (2010); 1 Williston on Contracts §§ 1:6; 68:1 (4th ed. 2010)).

With this in mind, the Court is at a bit of a loss why CAF continues to assert a claim based on *quantum meruit* for compensation regarding the 20 FTEs.  Presumably, CAF's position is that its (or more particularly Ferrigno's) providing site management services at the PGDP entitled it to compensation for Ferrigno, the other contracted-for CAF associates, *and* the 20 FTEs it wanted hired, which Ferrigno referred to as "a concession to essentially compensate CAF not having business due to [his] leaving and acting full time at Paducah." (Docket No. 35-5.)  But this reasoning does not mesh with either the purpose or requisite elements of a *quantum meruit* claim.  Namely, no actual service was ever provided by the 20 FTEs because they were never hired.  Defendants received no "valuable services rendered" by the never-hired 20 FTEs, nor could Defendants "accept that service."  Certainly Ferrigno and the other contracted-for CAF associates rendered valuable service to Defendants, but they did so under the definitive subcontracts for their employment and were compensated duly pursuant to those agreements.  CAF does not assert that Defendants owe it any outstanding compensation for services actually rendered.  In essence, CAF attempts to recover its expectation profits that it would have realized had an agreement for the 20 FTEs been entered into and carried out.  But this is not a case where Defendants received the benefit of the 20 FTEs' services and failed to compensate CAF for them.  Defendants received the value of no such service, and CAF provided no such service.  The services CAF and Ferrigno did provide were paid for.

Ultimately, *quantum meruit* does not provide for the recovery CAF seeks, which is essentially its expected but unrealized profit from the 20 FTEs that were never actually hired.  Accordingly, CAF's *quantum meruit* claim fails as a matter of law, and the Court will GRANT Defendants' Motions for Summary Judgment with respect to Count 2 and CAF's *quantum meruit* claim.

### III.    Unjust Enrichment

In Count 3 of its Complaint, CAF alleges unjust enrichment based on Defendants' "failure to compensate CAF in full" for the services CAF provided in managing the PGDP site.  (Docket No. 1, at 16.)   Defendants argue that CAF's unjust enrichment claims must fail "[b]ecause CAF entered into a definitive subcontract with Portage for Ferrigno's services, and was paid in full pursuant to such contract."  (Docket No. 36-1, at 18.)

Unjust enrichment is a theory of restitutionary relief where damages are based directly on a benefit conferred on and retained by a defendant.  *J.P. White*, 2011 WL 1706751, at *5.  "The theory of unjust enrichment is an equitable doctrine, and the application of an equitable doctrine to the facts of a case is a question of law."  *Javier Steel Corp. v. Cent. Bridge Co.*, 353 S.W.3d 356, 359 (Ky. Ct. App.) (internal citations omitted), *discretionary review denied*, (Ky. Nov. 16, 2011).  To prevail on an unjust enrichment claim under Kentucky law, a plaintiff must establish three elements:  (1) that a benefit was conferred on the defendant at the plaintiff's expense, (2) a resulting appreciation of that benefit by the defendant, and (3) inequitable retention of that

benefit without payment for its value. *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009).  "Unlike *quantum meruit*, a benefit must be conferred and retained before one may recover under unjust enrichment." *J.P White*, 2011 WL 1706751, at *5.

In its response to Portage's Motion for Summary Judgment, CAF effectively muddles its unjust enrichment claim with its other equitable claims of *quantum meruit* and promissory estoppel.  The Court reads CAF's argument with respect to unjust enrichment as follows: CAF conferred a benefit on Defendants by sending Ferrigno to Paducah at the expense of CAF's ongoing business in Colorado; Defendants appreciated that benefit by actually getting Ferrigno and CAF's site-management services; and Defendants inequitably retained that benefit without paying for its full value, which by CAF's reasoning includes Ferrigno's opportunity cost of coming to Paducah and, correspondingly, the profit from the 20 FTEs.  Portage, on the other hand, argues that "CAF attempts to use its unjust enrichment claim to obtain from the Court what it was unable to obtain in negotiations."  (Docket No. 36-1, at 19.)  To some extent, Portage is correct.

The facts here show that Defendants received the benefit of CAF and Ferrigno's services in managing the PGDP site.  The facts also show that pursuant to the subcontract for those services CAF and Ferrigno were duly compensated.  And as Ferrigno has acknowledged, Defendants even paid him a $50,000 sign-on bonus.  But Defendants received no benefit from the services of the 20 FTEs because those individuals were never employed.  Whatever money Defendants' saved by not

employing those 20 FTEs is logically not the equivalent of CAF "conferring a benefit upon" Defendants.   Again, what CAF ultimately seeks to recover is its expectation loss—that is, the profit it expected (and wanted) to realize from the hiring of the 20 FTEs.  But to allow CAF to proceed based on an unjust enrichment theory would stretch the purpose and rationale of this "theory of restitutionary relief."   The Court cannot oblige CAF in this regard.  Because the Court finds as a matter of law that CAF has not established the requisite elements for an unjust enrichment claim, summary judgment is appropriate.   The Court therefore will GRANT Defendants' Motions for Summary Judgment on CAF's unjust enrichment claims in Count 3 of its Complaint.

## IV.      Promissory Estoppel

In Count 4 of its Complaint, CAF asserts its final equitable claim based on a theory of promissory estoppel.  (Docket No. 1, at 17.)  CAF alleges that Defendants consistently promised they would hire the 20 FTEs if Ferrigno and CAF agreed to manage the PGDP site, that Defendants reasonably expected that promise would induce CAF to take over management of the site, that in reliance on that promise CAF allowed Ferrigno to relocate to Paducah and manage the PGDP site, and that CAF has been damaged by its reliance on that promise.  (*See* Docket No. 1, at 17.)  Defendants argue that CAF's promissory estoppel claim fails in light of the definitive subcontracts for Ferrigno's services, (Docket Nos. 36-3; 36-4), given that those agreements "did not require Portage to hire 20 additional FTEs in consideration of Ferrigno's services." (Docket No. 36-1, at 23.)  CAF responds that Defendants "fail[] to recognize that the

basis of [its] claim is not the hours of service it provided at PGDP but rather the detriment it has suffered as a result of giving up the benefit of its sole rainmaker for nearly a full year." (Docket No. 41, at 32.) Therefore, CAF reasons that its promissory estoppel claim is not barred by the subcontract for Ferrigno's services because the scope and subject matter of that agreement differ from the basis of its promissory estoppel claim.

Under Kentucky law, the elements of promissory estoppel are: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promise; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise." *Bergman v. Baptist Healthcare Sys., Inc.*, 344 F. Supp. 2d 998, 1003 (W.D. Ky. 2004) (quoting *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F. Supp. 714, 718 (W.D. Ky. 2001)). Additionally, the promisee's reliance on the promise must be justified. *See Butler v. Progressive Cas. Ins. Co.*, 2005 WL 1009621, at *4 (W.D. Ky. 2005); *FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 507 (E.D. Ky. 2002); *see also McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 12-13 (Ky. Ct. App. 1990).

As this Court has recently stated, "[P]romissory estoppel is not designed to give a party to a negotiated contract a 'second bite at the apple in the event it fails to prove breach of contract.'" *Miller v. Reminger Co.*, 2012 WL 2050239, *9 (W.D. Ky. June 6, 2012) (quoting *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990)). Here, however, the Court does not believe CAF's promissory estoppel claim

can so easily be dismissed as attempting a "second bite at the apple."  Despite having found that the MOU is an unenforceable preliminary agreement (for which there can be no breach), the Court is satisfied CAF has presented sufficient evidence to proceed with its promissory estoppel claim.  The Court agrees with CAF that its promissory estoppel claim is not barred by the subcontract for Ferrigno's services, and apart from that subcontract, CAF's promissory estoppel claim appears to satisfy the requirements for establishing a prima facie case.  CAF has offered evidence upon which a finder of fact could find a promise to hire the 20 FTEs, which Defendants reasonably expected to, and which did, induce action or forbearance on CAF's part.

Defendants assert that the "merger clause" of the subcontract for Ferrigno's services precludes CAF's promissory estoppel claim.  That clause provides: "The Subcontract embodies the entire agreement between Contractor and Subcontractor and supersedes all other writings.  The parties shall not be bound by or liable for any statement, representation, promise, inducement or understanding not set forth herein." (Docket No. 36-1, at 23 (referencing Docket No. 36-3, at 3).)  But, as CAF urges, that clause addresses a "related, but distinct matter" insofar as the alleged promise regarding the FTEs and CAF's action or forbearance in reliance thereon were neither mentioned nor addressed by that subcontract.  (Docket No. 41, at 34 (quoting *Gardner Denver Drum LLC v. Goodier*, 2006 WL 1005161, at *5 (W.D. Ky. Apr. 14, 2006).)  On this point, the Court agrees and finds that the merger clause does not extinguish CAF's promissory estoppel claim founded upon Defendants' alleged promise to hire the 20 FTEs.

In sum, the Court is satisfied that CAF has come forward with sufficient evidence demonstrating a question of material fact whether Defendants promised to hire the 20 FTEs with the reasonable expectation that promise would induce action or forbearance on CAF's part, and that CAF justifiably relied on that promise. That is not to say whether CAF will ultimately prevail before a finder of fact, but only that summary judgment is inappropriate on its promissory estoppel claim. Therefore, the Court will DENY Defendants' Motions for Summary Judgment on CAF's promissory estoppel claim in Count 4 of its Complaint.

**V.     Breach of Duty of Good Faith and Fair Dealing**

In Count 5 of its Complaint, CAF alleges that Defendants entered into the MOU and other agreements with CAF and accepted CAF's performance of its duties under those agreements, with knowledge that they would not hire the 20 FTEs. (Docket No. 1, at 17.) CAF also alleges that Defendants attempted to offer FTEs of a substantially lesser value than anticipated. Each of these acts on the part of Defendants, CAF maintains, amounts to a breach of the duty of good faith and fair dealing.

"Under Kentucky law, it is well-established that the implied covenant of good faith and fair dealing arises from an enforceable contract." *Giverny Gardens*, 147 F. App'x at 450 (citing *Auto Channel*, 144 F. Supp. 2d at 791; *Ranier v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991)). Having found that the MOU is unenforceable under Kentucky law, CAF cannot maintain a claim for breach of the implied duty of good faith and fair dealing. *See id.* Thus, summary judgment is appropriate, and the

Court will GRANT Defendants' Motions for Summary Judgment as to CAF's breach of good faith and fair dealing claim in Count 5 of its Complaint.

## VI.    Negligent Misrepresentation

In Count 6 of its Complaint, CAF alleges that Defendants, in their business or commercial capacity, represented to CAF that they were in the position to hire, and would hire, the 20 FTEs when they should have known these representations were false and that CAF would rely on them.   (Docket No. 1, at 18.)   In *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, the Kentucky Supreme Court adopted the Restatement (Second) of Torts' elements for negligent misrepresentation:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justified reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

134 S.W. 3d 575, 580 (Ky. 2004) (quoting Restatement (Second) of Torts § 552 (1977)).

"[A] negligent misrepresentation claim requires proof of an actionable misrepresentation, *i.e.*, 'false information.'" *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 553-54 (Ky. 2009) (citing *Presnell*, 134 S.W.3d at 575).   "[I]mplicit misrepresentations . . . are not enough to state a prima facie case as to this particular tort because negligent misrepresentation requires an affirmative false statement." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 (Ky. 2011) (citing *Republic Bank & Trust Co. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 714 (W.D. Ky. 2010)).

Defendants argue that CAF's negligent misrepresentation claim fails for several reasons:  (1) CAF has not identified an affirmative false statement on the part of Defendants; (2) CAF cannot base its claim on Portage's alleged promise that it would hire the 20 FTEs; (3) CAF cannot show that it justifiable relied on any alleged promise by Portage that it would hire "professional" FTEs; and (4) Kentucky's economic loss doctrine precludes a negligent misrepresentation claim in commercial transactions.  (*See* Docket No. 36-1, at 27-28.)

First, Defendants argue that CAF has not identified any particular affirmative false statement on the part of Defendants.  However, CAF points to "[t]he MOU and related communications" as "constitut[ing] a material misrepresentation that Portage was in a position to immediately begin retaining CAF FTEs."  (Docket No. 41, at 35.)  Specifically, CAF cites the language of the MOU in which Defendants represent a subcontract will be prepared by which Defendants will hire the additional 20 FTEs. Here, the Court is satisfied that CAF has presented sufficient evidence of Defendants' affirmative representations via the MOU and the correspondence among the parties to establish a prima facie case for negligent misrepresentation.  Second, while the Court agrees with Defendant's statement that "a party's intent to perform a promise or an agreement cannot form the basis of a negligent misrepresentation claim," CAF's negligent misrepresentation claim does not allege anything in regard to Defendant's "intent." (Docket No. 36-1, at 28 (quoting *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 619 (Ky. Ct. App. 2011).)  Whether Defendants "intended" to perform does not affect whether they failed to exercise reasonable care in communicating a false

representation to CAF. Third, the Court agrees with CAF that whether its reliance on Defendants' representations was reasonable is question of fact for the jury and, therefore, cannot establish a basis for summary judgment on CAF's negligent misrepresentation claim.

Finally, the Court disagrees with Defendants' fourth argument that CAF's negligent misrepresentation claim in this context cannot survive the economic loss doctrine. *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, the recent Kentucky Supreme Court case upon which Defendants rely, is distinguishable in that it dealt with the sale of goods where there was an enforceable contract. *See* 348 S.W.3d at 744-46. There, the Court recognized *Presnell* as establishing negligent misrepresentation as a basis for recovery, but noted that in *Presnell* there was no contract between the plaintiff and defendant and "[m]oreover, there was no product involved." *Id.* at 744 (discussing *Presnell*, 134 S.W.3d at 575-78). *Giddings & Lewis* then went on to hold that the economic loss doctrine extended to claims of negligent misrepresentation in products liability actions. *Id.* at 746. But *Giddings & Lewis* neither overruled nor looked disfavorably on *Presnell*, where the Court had allowed recovery of economic loss (which it defined as "[a] monetary loss such as lost wages or lost profits") in a negligent misrepresentation action. *See Presnell*, 134 S.W. 3d at 577 n.1, 582 (quoting Black's Law Dictionary 530 (7th ed. 1999)). Furthermore, this Court has previously noted that Kentucky law limits the applicability of the economic loss doctrine to the context of products liability. *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005). Here, CAF alleges that Defendants made false statements in relation

to the hiring of the 20 FTEs, particularly whether Defendants were actually in a position to hire those 20 FTEs, and that CAF justifiably relied on those representations in deciding to take the PGDP job.  This is distinct and separate from any claim CAF could assert for breach of the subcontract for Ferrigno's services.  Therefore, in light of the Kentucky Supreme Court's decisions in *Presnell* and *Giddings & Lewis*, and CAF's proffered evidence, the Court concludes that CAF's allegations are sufficient to avoid summary judgment on its negligent misrepresentation claim.

Accordingly, the Court finds CAF has presented sufficient evidence to establish a genuine issue of material fact and thus will DENY Defendants' Motions for Summary Judgment in relation to CAF's negligent misrepresentation claim.

## VII.    Fraudulent Misrepresentation

Finally, in Count 7 of its Complaint, CAF alleges fraudulent misrepresentation in that Defendants represented they were in a position to hire the 20 FTEs with knowledge that representation was false.  (Docket No. 1, at 19.)  Defendants argue this claim fails as a matter of law because any representations made were concerning future conduct and because CAF cannot establish its reliance on any alleged misrepresentations.  (Docket No. 36-1, at 24-27.)

Under Kentucky law, an action for fraudulent misrepresentation requires six elements:  "(a) a material misrepresentation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury."  *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357,

359 (Ky. Ct. App. 1978); *accord United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  A claim for fraudulent misrepresentation: "cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct, upon mere failure to perform a promise . . . or upon failure to fulfill an agreement to do something at a future time or to make good subsequent conditions which have been assured.  Such nonperformance alone has frequently been held not even to constitute evidence of fraud."  *Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp.*, 379 S.W.2d 736, 740 (Ky. 1964) (quoting 24 Am. Jur. *Fraud and Deceit* § 267). "However, a statement as to future conduct may form the basis for a misrepresentation claim if made with the intent to induce the other party to enter into a contract."  *Davis*, 399 F. Supp. 2d at 800.  This exception appears applicable to CAF's claim here.  CAF alleges Defendants represented they were in a position to hire the 20 FTEs, with the knowledge they were not, so as to induce CAF to take over management of the PGDP site.  This allegation is sufficient to state a claim for fraud.

Defendants argue that CAF still cannot establish reliance on any alleged misrepresentations when those alleged misrepresentations contradict a written agreement.  Certainly, "a party may not rely on oral representations that conflict with written disclaimers to the contrary which the complaining party earlier specifically acknowledged in writing."  *Rivermont*, 113 S.W.3d at 640.  To this end, Defendants argue (1) that CAF acknowledged it was not relying on oral representations by signing the subcontract for Ferrigno's services which contained a merger clause, and (2) that CAF cannot rely on any alleged oral representations that contradict the terms of the

MOU.  The Court disagrees.  For one, the subcontract for Ferrigno's services does not purport to address the issues of the 20 FTEs; thus, that agreement sufficiently differs in both scope and subject matter such that the merger clause therein cannot be read to prohibit CAF from relying on Defendants' alleged misrepresentations outside the scope of that agreement.  Second, the parties' representations contained in the MOU are not as contradictory with the misrepresentations CAF alleges as Defendants suggest.  Moreover, as discussed above, the MOU does not represent a binding contractual agreement on either party.  Therefore, the Court cannot conclude as a matter of law that CAF was unreasonable in relying, or could not rely, upon Defendants' alleged misrepresentations.

Accordingly, the Court finds CAF has established the requisite elements for a prima facie claim of fraudulent misrepresentation.  The Court takes no position on whether CAF will ultimately succeed in proving its case to a jury, but nonetheless finds that it has presented sufficient evidence to survive summary judgment.  Accordingly, the Court will DENY Defendants' Motions for Summary Judgment as to CAF's Count 7 claim of fraudulent misrepresentation.

CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

(1) Plaintiff's Motion for Partial Summary Judgment, (Docket No. 35), is DENIED.

(2) Defendants Paducah Remediation Services, LLC, and Portage, Inc.'s Motions for Summary Judgment, (Docket Nos. 34 & 36, respectively), are each GRANTED IN PART and DENIED IN PART as follows:

   (a) Defendants' Motions for Summary Judgment as to Count 1 (Breach of Contract), Count 2 (*Quantum Meruit*), Count 3 (Unjust Enrichment), and Count 5 (Breach of Duty of Good Faith and Fair Dealing) are GRANTED;

   (b) Defendants Motions for Summary Judgment as to Count 4 (Promissory Estoppel), Count 6 (Negligent Misrepresentation), and Count 7 (Fraudulent Misrepresentation) are DENIED.

(3) Based on Plaintiff's indication that "[i]t does not intend to pursue further its Tortious Interference or Defamation Claims," (Docket No. 41, at 37), Count 8 (Defamation) and Count 9 (Tortious Interference) are hereby DISMISSED with prejudice.

IT IS SO ORDERED.

Date:

cc:     Counsel